George M. Fanelli, J.
This is an action brought by interested residents and taxpayers of the City of Yonkers for a declaratory judgment and injunction, wherein they seek, inter alia, to declare illegal and void the sale of a certain parcel of real property owned and sold by the City of Yonkers at public auction on February 11, 1958, to the defendant, Vioe Realty Corp., which was the successful bidder and purchaser, and to declare illegal and void all the acts performed by the officials of said city relative to said sale.
*876 Principally, plaintiffs challenge the validity of the sale and the procedure used by defendant city with respect thereto. They contend that the subject property was “ city real estate ” and as such should have been sold pursuant to the requirements of section 23 of the General City Law and section 37 of the Second Class Cities Law.
The relevant provisions governing the sale of “ city real estate ”, found in the General City Law (§ 23, subd. 2, par. b), provide: “No sale or lease of city real estate or any franchise belonging to or under the control of the city shall be made or authorized except by vote of three-fourths of all the members of the common council or corresponding legislative body of the city. In case of a proposed sale or lease of real estate or of a franchise, the ordinance must provide for a disposition of the same at public auction to the highest bidder, under proper regulations as to the giving of security and after public notice to be published at least once each week for three weeks in the official paper or papers. A sale or lease of real estate or a franchise shall not be valid or take effect unless made as aforesaid and subsequently approved by a resolution of the board of estimate and apportionment in any city having such a board, and also approved by the mayor * * *. In any city the question whether any proposed sale or lease of city real estate or of any franchise belonging to or under the control of the city shall be approved shall, upon a demand being filed, as hereinafter provided, be submitted to the voters of such city at a general or special election, after public notice to be published at least once each week for three weeks in the official paper or papers. Such demand shall be subscribed and acknowledged by voters of the city equal in number to at least ten per centum of the total number of votes cast in such city at the last preceding general election and shall be filed in the office of the clerk of such city before the adoption of an ordinance or resolution making or authorizing such sale or lease. If such demand is filed, as aforesaid, such sale or lease of real estate or such franchise shall not take effect unless in addition to the foregoing requirements a majority of the electors voting thereon at such election shall vote in the affirmative. ’ ’
Section 37 of the Second Class Cities Law, in similar language (except for the referendum feature) provides for the passage of an ordinance by the Common Council directing the sale and publication in the same manner.
Defendants concede that the property in question was neither offered for sale nor ultimately sold in accordance with the afore-mentioned requirements because, as they contend, the *877 property was not “ city real estate ”, and they justify the sale and the procedure employed by virtue of the authority found in certain Local Laws enacted by the Common Council amending the City’s Supplemental Charter which deal with the sale of property acquired by the city as the result of the foreclosure of tax liens. They strenuously urge that property acquired by a city as the result of the foreclosure of tax liens is not within the contemplation of the afore-mentioned sections of the General City Law and the Second Class Cities Law.
Thus, it would seem that one of the pivotal questions upon which this decision hinges is the interpretation and construction of the words, “city real estate ”, since both statutes fail to define the phrase. Was the property in question “city real estate ” within the meaning of the afore-mentioned statutes on the date it was sold to defendant, Vioe Realty Corp., to wit, February 11,1958 f
The instant property, located on Central Park Avenue, has a litigious background. The record indicates that in 1947 the city acquired title to the same as the result of a tax lien foreclosure action. It was then known as Block 4877, Lot 1 on the official Tax Map of the City of Yonkers and consisted of approximately 54 acres. It was in some areas low and swampy and in an effort to fill a portion thereof to the street level grade, the city began to deposit thereon various materials and in general utilized it as a refuse dumping ground. While most of the official municipal records referred to the property as the ‘ ‘ Reclamation Project ” and in other instances it was called “ the dump ”, nevertheles, the fact remains that the southerly portion thereof which is the subject matter of this lawsuit (consisting of approximately 7 acres and now known as Block 4877, Lot 250), was used by the city for the purpose of a refuse dumping ground. This practice continued for several years until 1949, when, in an action brought by certain neighboring taxpayers, the city consented to an injunction pendente lite enjoining it from placing “live ” garbage on the property but permitting it to deposit residual material thereon from incinerators, together with nonburnable and nonputrescible debris, under certain precautionary conditions. Thereafter, it was contended by the plaintiffs in that action (Nolan v. City of Yonkers, 15 Misc 2d 828) that the city had violated said temporary injunction and they thereupon sought permanent injunctive relief. In 1954, after a hearing, Mr. Justice Brennan found that the city was still using the property as a depositary for ‘ ‘ live ’ ’ garbage and he permanently restrained the city from using or operating the property as a refuse dumping ground and from dumping or *878 depositing thereon any material of any kind or nature other than “ clean earth, rocks and stones ”. This determination was affirmed by the Appellate Division, Second Department, in March, 1955 (285 App. Div. 978), and the record in this case indicates that from then on all operations on this property ceased (except perhaps for the maintenance of a watchman until the end of that year), and there is no evidence before this court to sliow that from March, 1955 to February, 1958 — a period of almost three years — the property was used by the city for any purpose whatsoever.
The record further indicates that in order to provide for the sale of property acquired by the City of Yonkers as the result of tax lien foreclosures, certain local laws were enacted by the Common Council. Under section 12-a of article V-A of the Charter of the City of Yonkers (L. 1908, ch. 452, as amd. by Local Laws, 1940, Ño. 4 of City of Yonkers), the City Manager or such other officer as may be empowered by an ordinance of the Common Council, is vested with the power to sell any property acquired by the city as the result of a tax lien foreclosure action upon such terms and for such sums as the Common Council may, by resolution, fix and determine if said property was not “ assigned by the common council for a public use.” Thereafter (under Local Laws, 1946, No. 10 of City of Yonkers; Yonkers City Charter, art. III-D), the charter was further amended to the extent of creating a Department of Real Estate Liquidation to be headed by a Liquidator (whose title was later changed in 1949 to Director of Real Estate Sales) appointed by the City Manager. The principal function of this department is to “ expedite the sale of city owned property acquired through the foreclosure of tax liens ” (Yonkers City Charter, art. III-D, § 2; italics supplied).
In the light of the afore-mentioned background and, bearing in mind these legislative enactments dealing with property acquired by the city through tax lien foreclosure actions, there is posed the question: what was the status of the subject property when it was offered by the city through the Director at public auction on February 11, 1958?
Plaintiffs argue that since the property was in fact publicly used it must necessarily follow that it was assigned by the Common Council for a public use and, that having once taken on such an aura it must remain for all times in the category of “ city real estate ”. The court disagrees with this contention and finds it to be without merit, particularly in the absence of a definite and clear, act on the part of the Common Council so assigning or dedicating such property for a public use or *879 purpose. At the outset, it must be noted that this property was never purchased by the city. Bather, it was forced upon the city and was acquired involuntarily as the result of a tax lien foreclosure action brought by it for unpaid taxes. As such it could be sold by the Director at the direction of the City Manager pursuant to the provisions of section 12-a of article V-A (supra) ‘ ‘ if not assigned by the common council for a public use ’ ’ (italics supplied). In search of an appropriate answer to the question posed in this case — whether or not this property was assigned by the Common Council for a public use — the recent decision of our Appellate Division in Hayes v. City of Yonkers (7 A D 2d 860), although rendered under a different factual situation, is quite relevant to the issue at bar. In that case the court held that decisions relating to a sale or other disposition of real property belonging to a municipality such as the City of Yonkers must be evidenced through the adoption of a resolution by its governing body. Here, plaintiffs should not be permitted to spell out the will of the Common Council to assign this property for a public use in the absence of a clear, convincing, unequivocal and unambiguous legislative mandate or declaration. Plaintiffs have failed to show by what authority the markings on the card ((plaintiffs’ exhibit 20) i.e., “City wants “ City Dump “ not available for sale ” were allegedly made by certain administrative employees, or that they were ever sanctioned by any formal enactment of the Common Council. The prerogative to assign property for a public use is legislative and it is only the Common Council which determines the necessity for and the time and manner of its exercise. Similarly, the exemption obtained by the city indicates an intent more to save taxes rather than an intent to assign the property for a public use within the contemplation of the said Local Law (Yonkers City Charter, art. V-A, § 12-a, supra). While it may be true that this parcel was for a period of years used for refuse dumping purposes in connection with an effort on the part of the city to reclaim the land and thus for such period served temporarily a public use, yet, the record is barren of any legislative act of the Common Council formally assigning this property for public use. As a matter of fact, the use for dumping purposes was labelled illegal and outlawed by Mr. Justice Bhexuax and such operations and usefulness as a dump did concededly discontinue in the Spring of 1955. It does not follow that a parcel of land such as this one having once taken on a temporary public use or purpose must then in perpetuity be tainted with such use, particularly bearing in mind that after its use was discontinued in 1955, for a period of *880 three years thereafter and up to the time of the public auction it remaineded idle and served no purpose whatsoever. Moreover, the evidence indicates that this property was since its acquisition carried on the records and listings of the Beal Estate Liquidation Department and offered by bulletin to brokers; that from time to time portions thereof were sold and approved by resolution of the Common Council and that some of the plaintiffs or their respective spouses so purchased parcels from the city.
Accordingly, this court holds that the subject property was never assigned by the Common Council for a public use within the meaning of the afore-mentioned Local Law, and that the term “ city real estate ” was never intended by the Legislature to apply to land, such as this property, acquired as the result of tax sales. Not every parcel of property owned by a city can be classified as “ city real estate ” within the meaning of section 23 of the General City Law and section 37 of the Second Class Cities Law. It certainly was not the legislative intent of these sections to provide such a cumbersome procedure as therein provided as a prerequisite for the sale of lands which had thus been forced upon a city by failure of owners to pay taxes (McSweeney v. Bazinet, 269 App. Div. 213, affd. 295 N. Y. 797). For this court to reach a contrary conclusion would require straining and a construction not in keeping with the spirit and purpose sought to be accomplished by the Legislature when it enacted the afore-mentioned statutes 45 and 50 years ago. Clearly, it cannot reasonably be said that the Legislature when it enacted these sections ever envisioned that a municipality such as the City of Yonkers would some day be compelled by wholesale to foreclose real property or acquire them through ‘1 in rem ” proceedings because of delinquent real estate taxes to such an extent that they would be practically forced into the real estate business, and that it would thus be required to create a special liquidating department for the purpose of unloading and expediting a speedy sale of these properties so that they could be quickly placed back on the tax rolls. It would seem that the modern trend is to the contrary, and the Legislature has seen fit in some instances to facilitate the sale by a municipality of lands acquired because of tax delinquencies to the extent of even eliminating the advertising for prior bids where it might be otherwise required by law (Tax Law, § 166-i).
The court has examined the remaining contentions urged by plaintiffs and finds them to be without merit. Plaintiffs have made no factual showing of fraud, bad faith, misconduct, waste of public funds or property, dereliction of duty on the part of any official of the city, or that the manner in which the sale was *881 conducted was such as to stifle or deter bidding so as to preclude the highest possible monetary return to the city. On the contrary, the record indicates that the property was ordered sold by resolution of the Common Council; that it was sold at public auction (as distinguished from the private sale method used for the other portions of Block 4877, Lot 1); that the sale was advertised twice in a local newspaper; that the auction was conducted openly and publicly in the chambers of the Common Council with an upset price of $110,000; that the property was ultimately sold for the sum of $250,000 to the highest bidder; and that said sale was approved by an appropriate resolution of the Common Council.
The court concludes that plaintiffs have failed to prove by a fair preponderance of the evidence the allegations of their complaint, and therefore, the complaint must be and is dismissed, but without costs.
The foregoing constitutes the decision of this court in accordance with the provisions of section 440 of the Civil Practice Act. All exhibits may be obtained from the Clerk of Special Term, Part II.
Settle judgment on notice.